ALEJANDRO IRIZARRY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Dynaweld, Inc., Appellee).

Second District   No. 2—02—0350WC

Opinion filed February 25, 2003.

John J. Castaneda and Molly C. Mason, both of Corti, Freeman & Alesky, of Chicago, for appellant.

Victor P. Shane and Dennis J. Duffy, both of Scopelitis, Garvin, Light & Hanson, P.C., of Chicago, for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

Alejandro Irizarry filed an application for adjustment of claim seeking workers' compensation benefits for an industrial accident he sustained while working for Dynaweld, Inc. He alleged injuries to multiple parts of his body, including his left knee. The matter proceeded to a hearing before arbitrator Angelo Caliendo under section 19(b) of the Workers' Compensation Act (820 ILCS 305/19(b) (West 2000)). Arbitrator Caliendo awarded medical expenses and temporary total disability (TTD) benefits through the date of the hearing. No appeal was taken from the arbitrator's decision.

The matter subsequently proceeded to a second section 19(b) hearing where arbitrator Caliendo awarded additional TTD benefits for two periods. The latest period terminated 15 months before the hearing. The arbitrator denied Irizarry's claim for additional TTD benefits, further medical expenses, and vocational rehabilitation. Irizarry appealed to the Illinois Industrial Commission (Commission), which affirmed the arbitrator's decision. He then appealed to the Kane County circuit court, which confirmed the Commission's decision.

The matter ultimately proceeded to a final hearing before arbitrator Peter Akemann, who awarded permanent partial disability (PPD) benefits representing 40% loss of use of Irizarry's left leg. The arbitrator denied all other claims for compensation and medical expenses. Irizarry appealed to the Commission, which affirmed the arbitrator's decision. He then appealed to the Kane County circuit court, which confirmed the Commission's decision. Irizarry now brings this appeal, claiming the Commission erred in three respects: (1) concluding that injuries to his head, neck, right shoulder, and back were not causally connected to his industrial accident; (2) denying additional TTD benefits and medical expenses; and (3) awarding benefits for perma-

nent partial, rather than permanent total, disability. We reverse and remand.

## BACKGROUND

Irizarry was working for Dynaweld on January 21, 1991, when he fell and injured himself. The next day he visited Mercy Hospital and was diagnosed with an acute contusion/sprain of his left knee. He continued treating with Dr. David Clark, and an MRI showed evidence of an injury to the medial collateral ligament in his left knee. In March of 1991 Dr. Clark performed arthroscopic surgery on the knee for patellar chondromalacia. Irizarry's postoperative recovery was slow and marked by left leg weakness. To evaluate the weakness problem, Dr. Clark obtained a lumbar MRI in June of 1991, which revealed minimal degenerative changes with some bulging at L4-L5 and L5-S1. In July of 1991 Irizarry also underwent an EMG/NCV of the left leg, which yielded "essentially normal" results.

Dr. Clark issued a work release on September 12, 1991, stating: "I really feel it would be most important for [Irizarry] to try and get on with it instead of looking for disability which I am beginning to feel is the major thrust behind all of this situation." On the following day, Irizarry visited Dr. Thomas Townsend (chiropractor) and received a note describing him as "totally incapacitated" due to pain in his neck, right shoulder, back, and left knee. A cervical MRI revealed normal findings. X rays were interpreted as showing "early degenerative bone proliferation" in the thoracic and lumbar regions, and biomechanical alterations at all levels.

Townsend referred Irizarry to Dr. Michael Morgenstern for his left knee complaints. Both Townsend and Morgenstern rendered subsequent treatment and authorized him to remain off work. Dr. Morgenstern administered an injection of Depo-Medrol and Marcaine in Irizarry's left knee. A lumbar CT scan in October of 1991 showed findings consistent with the prior MRI: Schmorl's nodes at L4 and a posterior disc bulge at L4-L5, but no stenosis or facet joint pathology.

Irizarry remained off work, and his workers' compensation claim proceeded to a section 19(b) hearing before arbitrator Caliendo on October 11, 1991. The arbitrator awarded TTD benefits covering the entire period between Irizarry's accident and the arbitration hearing. He also awarded medical expenses totaling $2,504.80. The expenses included bills from Drs. Morgenstern and Townsend.

A note from Dr. Morgenstern on October 30, 1991, reads: "Today, the patient additionally states he injured his low back." Irizarry subsequently complained of numbness and tingling in the fourth and fifth fingers of his right hand. An EMG of his upper extremities in

November of 1991 revealed normal findings. Shortly afterward Doctor Morgenstern administered two epidural injections into Irizarry's lower back. In February of 1992 Doctor Morgenstern performed a second arthroscopic surgery on Irizarry's left knee. The procedure involved debriding a partial tear of the anterior cruciate ligament and a partial synovectomy of the medial and lateral compartments.

On April 8, 1992, Townsend released Irizarry to work, noting that he was permanently incapable of performing "heavy and moderate work." Townsend restricted him from bending, stooping, lifting, pushing, pulling, climbing, elevation of the shoulders and arms, and repetitive head or neck movements involving flexion, extension, or rotation. During a functional capacity evaluation in mid-1992, Irizarry demonstrated abilities in the "light to sedentary" work category. Dr. Morgenstern issued a light-duty release on July 23, 1992, and Irizarry continued to complain of sciatica. A lumbar MRI in August of 1992 revealed disc degeneration at L4-L5 and L5-S1, with mild posterior bulging, but no stenosis or foraminal encroachment.

Dr. Morgenstern reviewed the MRI results and said Irizarry was "certainly not a surgical candidate." On September 3, 1992, the doctor opined that Irizarry was at maximum medical improvement and could not return to his usual work as a welder. Dynaweld gave him a referral for vocational rehabilitation services. Three months later he returned to Dr. Morgenstern with continued left knee complaints and received another injection.

In March of 1993 two rehabilitation consultants (Sylvia Sykes and Louisa Castellanos) issued a report describing Irizarry's participation in vocational rehabilitation. According to the report, Irizarry failed to contact three employers per week as requested. He cancelled two interviews with one employer before finally appearing. He told another employer he could only work the third shift and that he could not risk being cut because of a "blood problem." He refused to sit down during an interview with a third employer; instead, he stooped over the interviewer's desk and advised that he could not drive to and from work.

In April of 1993 Irizarry visited Dr. Benjamin Narrajos complaining of sharp, shooting lower back pain and dull neck pain. The doctor diagnosed chronic neck and lumbar strains with radiculopathy.

Castellanos prepared a follow-up rehabilitation report in April of 1993 stating that she had arranged for Irizarry to attend a job fair at Hollywood Casino. Irizarry asked her, "[I]f I get the job do I have to work it?" He later told Castellanos that he attended the fair and completed a job application. However, she followed up and discovered that the casino did not have an application on file for Irizarry and that

all applicants had received an interview. His rehabilitation file was closed.

The file was reopened in July of 1993, and four interviews were arranged for Irizarry. At the first interview he appeared with his shirt undone, held onto the wall as he walked, and needed assistance completing the job application. At the third interview he failed to complete the application (providing only his name and social security number) and told the interviewer he could not perform the work because of neck pain. He arrived at the fourth interview over an hour late. His rehabilitation file was again closed.

Irizarry returned to Dr. Morgenstern in November of 1993 and February of 1994 with complaints of back pain. Both times his physical examination was unchanged from 1992.

In June of 1994 Irizarry visited Dr. Leonard Kranzler for an examination at Dynaweld's request. He complained of lower back pain and bilateral leg pain (worse on the left) radiating into his heels. Doctor Kranzler conducted a physical examination and opined that Irizarry had no objective deficits and could perform unrestricted work. Specifically, the doctor noted that no anatomical basis existed for Irizarry's report of numbness on the left side of his body. The doctor also noted that Irizarry displayed positive results during a straight leg test but, at another point during the examination, he reached within 11 centimeters of his toes. According to the doctor, these findings were inconsistent.

In August of 1994 Irizarry visited Dr. John Martell for a left knee examination at Dynaweld's request. Dr. Martell found an anterior cruciate ligament deficiency with frequent giving way and early degenerative changes. He recommended a knee brace and mentioned a possible reconstruction of the anterior cruciate ligament if Irizarry did not experience improvement. The doctor advised that Irizarry could perform work with limited lifting (10 pounds frequent and 15 pounds occasional).

The matter proceeded to a second section 19(b) hearing before arbitrator Caliendo on December 12, 1994. In part, the arbitrator's written decision read:

> "The Petitioner was a forty-three year old welder who suffered injuries to his left knee, neck, right shoulder, and lower back on January 21, 1991, the date of accident.
>
> * * *
>
> The preponderance of the medical evidence shows that the Petitioner can, in fact, work. ***
>
> * * *

*** Dr. Clark, Petitioner's own physician, once questioned Petitioner's efforts when he wrote on September 12, 1991: 'I really feel it would be most important for [Petitioner] to go back to work and to try and get on with it instead of looking for disability which I am beginning to feel is the major thrust behind all of this situation.'

The Arbitrator also finds that the Petitioner was not a particularly credible witness."

After making these observations, arbitrator Caliendo awarded Irizarry additional TTD benefits covering two periods (October 12, 1991, through February 17, 1993, and March 8, 1993, through September 7, 1993). Beyond that award, however, the arbitrator denied additional TTD benefits (leaving a 15-month gap immediately preceding the hearing), medical expenses incurred since the first section 19(b) hearing, maintenance payments, and vocational rehabilitation. Irizarry appealed the arbitrator's decision to the Commission.

In April of 1995 Irizarry began treating with Dr. Roberto Levi, who ordered MRI scans of the left knee and lumbar spine. Those studies revealed: a possible low-grade partial tear of the anterior cruciate ligament; a "tiny" disc herniation at L4-L5 superimposed on disc bulging; and mild disc bulging at L5-S1. Dr. Levi performed a third left knee arthroscopy in June of 1995, including removal of plica synovial medelias.

On October 25, 1995, the Commission affirmed and adopted arbitrator Caliendo's decision from the second section 19(b) hearing. Irizarry appealed the Commission's decision to the Kane County circuit court.

Irizarry continued treating with Dr. Morgenstern and received lumbar epidural injections in July and September of 1995. Dr. Morgenstern also referred him to a pain management clinic, where he received treatment through November 20, 1995. He was authorized to perform modified work with restrictions on sustained sitting and walking.

On September 13, 1996, the circuit court confirmed the Commission's decision affirming arbitrator Caliendo's award from the second section 19(b) hearing. In an agreed order, the cause was remanded to the Commission "for further hearing on any other compensation, benefits or medical expenses that may be awarded consistent with the arbitrator's previous award."

In June of 1997 Irizarry underwent a lumbar MRI in Puerto Rico. The study revealed degenerative changes at L4-L5 and L5-S1. On August 7, 1997, Dr. Morgenstern issued a letter stating that Irizarry was unable to perform any type of work.

In June of 1998 Irizarry sought treatment from Dr. Steven Goldfarb, complaining of back pain and left leg pain. Irizarry was apparently living in Puerto Rico at the time. Dr. Goldfarb ordered a myelogram and a CT scan, which revealed no signs of disc herniation or spinal stenosis. He diagnosed chronic lower back pain and recommended rehabilitation. Irizarry returned in September of 1998 complaining of left knee pain. Dr. Morgenstern diagnosed "osteoarthritis with no specific injury" and administered two injections into the knee that month.

Also in September of 1998, Irizarry began treating with Dr. Steven Lekah for complaints of headaches and dizziness since his industrial accident. The doctor ordered MRI scans of his head and cervical spine. The MRI of his head revealed normal findings. The cervical MRI revealed mild spurring at C4-C5, suggesting mild narrowing of the right foramina. There was no disc herniation. Dr. Lekah recommended pain management with trigger-point injections. The injections were administered in November and December of 1998 by Dr. James Kelly. Dr. Kelly diagnosed myofascial pain.

The matter proceeded to a final arbitration hearing before arbitrator Peter Akemann on September 22, 1999. At the hearing Dynaweld disputed whether Irizarry's condition of ill-being was causally related to his industrial accident. Irizarry testified that he continued receiving medical treatment and had not received any workers' compensation benefits since the second section 19(b) hearing. He had completed his GED but said he could not read or write English. He said he moved to his native Puerto Rico in 1997 on a doctor's recommendation that he live in a warm climate. He acknowledged failing to seek any type of work in Puerto Rico. Regarding his symptoms, he said (1) his left knee hurt and was subject to swelling and giving way, (2) he could not turn his neck to the right, and (3) his lower back hurt with pain radiating into his feet. He said he could walk the distance between his car and the hearing room, but not much farther. He also said he could only sit or stand for 15 to 20 minutes.

After providing a summary of Irizarry's medical treatment, arbitrator Akemann's written decision read:

> "The Arbitrator notes that at the prior hearing in December of 1994, the Petitioner was denied further medical payments, temporary total disability payments, and vocational rehabilitation. This arbitrator, likewise, is not inclined to award further payments in these areas as well.
>
> The Arbitrator concludes that the medical records contain no evidence that Petitioner ever reported any injury to his head, neck, right shoulder, or low back to any physician for several months fol-

lowing the accident, until after June, 1991. The initial examination of the Petitioner's low back in June 1991 was to check for causes for the slow recovery of the Petitioner's left leg. Only thereafter did the Petitioner seek treatment for his back. There is no objective evidence of neurological or orthopaedic injury to the Petitioner's head, neck, low back or right shoulder as a result of the *** accident. All of the medical treatment that the Petitioner has undergone to those areas of the body, is related to subjective complaints unsupported by any verifiable injury.

The Petitioner's continued left knee complaints following hearing in December, 1994, are similarly related to subjective complaints which no longer are supported by objective evidence of continuing injury."

After making these observations, arbitrator Akemann denied TTD benefits and medical expenses for the period following the second section 19(b) hearing. Regarding permanent impairment, he awarded PPD benefits representing 40% loss of use of Irizarry's left leg.

Irizarry appealed to the Commission, which affirmed and adopted the arbitrator's decision. He then appealed to the Kane County circuit court, which confirmed the Commission's decision. This appeal followed.

## ANALYSIS

### 1. Causal Connection (Head, Neck, Right Shoulder, Back)

In addition to his left knee, Irizarry alleged that his industrial accident caused injuries to other parts of his body. At the section 19(b) stage, arbitrator Caliendo found a causal connection between Irizarry's condition of ill-being (as alleged) and his industrial accident. Such a finding is evident from at least two facts. First, the arbitrator described Irizarry as "a forty-three year old welder who suffered injuries to his left knee, *neck, right shoulder, and lower back* on January 21, 1991, the date of accident." (Emphasis added.) Second, the arbitrator ordered Dynaweld to pay medical bills from Dr. Townsend— whose treatment was directed at Irizarry's neck, right shoulder, and back. Obviously a finding of a causal connection underlies an award of medical expenses. Arbitrator Caliendo's causation determination was final and reviewable when he rendered his decision. See 820 ILCS 305/ 19(b) (West 2000) (noting that section 19(b) decisions "shall be conclusive as to all other questions except the nature and extent of [the claimant's] disability"). Since Dynaweld did not file a petition for review, the arbitrator's decision "[became] the decision of the Commission and *** conclusive." 820 ILCS 305/19(b) (West 2000).

But the Commission later adopted arbitrator Akemann's decision,

which rested on a conclusion that "no objective evidence [existed] of *** injury to the Petitioner's head, neck, low back or right shoulder *as a result of the *** accident.*" (Emphasis added.) In other words, the Commission found that no causal connection existed between Irizarry's industrial accident and any injuries to his head, neck, low back, and right shoulder. Accordingly, the Commission concluded: "All of the medical treatment that the Petitioner has undergone to those areas of the body, is related to subjective complaints unsupported by any verifiable injury." These conclusions are inconsistent with the Commission's section 19(b) decisions. At the section 19(b) stage, the Commission found a causal connection between Irizarry's industrial accident and his various alleged injuries (including injuries to his "neck, right shoulder, and lower back"). In the final proceeding, however, the Commission found no such connection regarding the alleged injuries to Irizarry's head, neck, lower back, and right shoulder. Furthermore, in the first section 19(b) proceeding, the Commission awarded medical expenses for treatment to Irizarry's neck, right shoulder, and back. Yet in the final proceeding the Commission stated that all such treatment failed to support an award.

Irizarry argues that the causation determination from the final proceeding violated the doctrines of *res judicata* and collateral estoppel. Since arbitrator Caliendo had already decided the causation issue, Irizarry asserts, Dynaweld was barred from raising it again before arbitrator Akemann. We agree that a bar existed, but not under *res judicata* or collateral estoppel. Those doctrines are invoked by final judgments in separate, prior actions. Although Irizarry's claim has proceeded through various stages, it still comprises only a single action. Under such circumstances, the bar Irizarry seeks stems from the "law of the case" doctrine. See *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681 (1994).

That doctrine has been explained as follows:

"The rule of the law of the case is a rule of practice, based on sound policy that, where an issue is once litigated and decided, that should be the end of the matter and the unreversed decision of a question of law or fact made during the course of litigation settles that question for all subsequent stages of the suit." *McDonald's Corp. v. Vittorio Ricci Chicago, Inc.*, 125 Ill. App. 3d 1083, 1086-87 (1984).

At the section 19(b) stage, arbitrator Caliendo determined that a causal connection existed between Irizarry's industrial accident and the alleged injuries to his left knee, neck, right shoulder, and back. The determination became a final judgment from which Dynaweld did not appeal. The determination thus became the law of the case, and Dy-

naweld was barred from raising the causation issue again during the final proceeding. Accordingly, arbitrator Akemann and the Commission erred in revisiting the issue.

Our holding does not apply to Irizarry's claim of a head injury. The record does not indicate that arbitrator Caliendo found a causal connection regarding such an injury.

## 2. Additional TTD, Medical Expenses, and Permanent Impairment

■ During the final proceeding, the Commission denied TTD benefits and medical expenses for the period since the second 19(b) hearing. The Commission also evaluated Irizarry's permanent impairment at 40% loss of use of his left leg. As noted above, the Commission erroneously considered that the requisite causal connection never existed between Irizarry's accident and the injuries to his neck, right shoulder, and back. We do not know how much, if any, impact that error had on the Commission's decisions regarding TTD benefits, medical expenses, and permanent impairment. We thus remand for new determinations in these areas.

■ According to the dissent, there is no need to remand because the Commission "has already found there is no objective evidence of neurological or orthopedic injury to the head, neck, lower back, or right shoulder." 337 Ill. App. 3d at 609-10. But the dissent omits a key part of the Commission's statement: the qualifying words, "as a result of the *** accident." The Commission discounted the aforementioned injuries by finding that they were never causally connected to Irizarry's industrial accident, not by finding that their former connection to the accident had ceased at some point without later resuming. Only the latter finding could sustain the result the Commission reached.

## CONCLUSION

For the foregoing reasons, we reverse the circuit court's judgment confirming the Commission's decision. The cause is remanded to the Commission for determinations consistent with this opinion.

Reversed and remanded with directions.

HOFFMAN, O'MALLEY, Jack, and GOLDENHERSH, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, dissenting:

I disagree that arbitrator Caliendo's second decision and arbitrator Akemann's findings and decision are inconsistent. Of utmost importance is to point out arbitrator Caliendo's decision concerns temporary disability while arbitrator Akemann's decision addresses permanency.

With respect to the majority's reliance upon arbitrator Caliendo's "description" of claimant, that is exactly what it appears the arbitrator stated, a "description." The one statement referred to by the majority should not be taken in isolation.

As that decision states, "At issue is the extent of Petitioner's temporary disability." Arbitrator Caliendo's decision does address the extent of claimant's temporary disability concerning his left knee, neck, right shoulder, and lower back.

In his second decision, Caliendo found that on September 12, 1991, Dr. Clark released claimant to return to work; that on July 23, 1992, Dr. Morgenstern released claimant to return to work; and that the preponderance of the medical evidence shows that petitioner can, in fact, work.

Arbitrator Caliendo also found that as a result of an examination by Dr. Kranzler on June 30, 1994, Kranzler did not elicit

> "any objective findings to substantiate the petitioner's current complaints of pain to his back. Dr. Kranzler noted several inconsistencies and found 'no reason to limit [petitioner's] work activities on the basis of his back examination.' Dr. Kranzler's findings are credible when taking into consideration prior diagnostic studies of the back which have resulted in essentially normal findings."

Additionally, Caliendo found that claimant refused to cooperate with respondent's vocational rehabilitation program:

> "Dr. Clark, Petitioner's own physician, once questioned Petitioner's efforts when he wrote on September 12, 1991: 'I really feel it would be most important for [Petitioner] to go back to work and to try and get on with it instead of looking for disability which I am beginning to feel is the major thrust behind all of this situation (PX3).' "

Although the majority accepts claimant's testimony that he could not speak English, Caliendo found claimant "not a particularly credible witness" including his ability to speak "basic English."

Arbitrator Caliendo's second decision refers in several paragraphs to the inconsistencies in the claimant's testimony, found him not credible, found that he would not cooperate with the rehabilitation consultant, found that his own physician, Dr. Clark, questioned his efforts to work, and found that, as Caliendo stated, the doctor indicated he should try to go back to work instead of looking for disability, which, the doctor stated, he was "beginning to feel [was] the major thrust behind all of this situation." With respect to the back injury, arbitrator Caliendo found that Dr. Kranzler examined the claimant and did not elicit any objective findings to substantiate the claimant's

complaints of pain to his back. The doctor noted several inconsistencies and found no reason to limit the claimant's work activities on the basis of his back examination. Since claimant's move back to Puerto Rico in 1997, he acknowledges he has not sought any type of work.

Contrary to claimant's argument and the majority decision, there is no inconsistency between arbitrators Akemann and Caliendo insofar as the second decision of Caliendo is concerned. In his second decision, October 25, 1995, Caliendo stopped the TTD at a date prior to the hearing date, stating that "the petitioner is able to secure employment and is not entitled to maintenance or further vocational rehabilitation from the respondent." I do not understand how Caliendo and Akemann, as arbitrators, were inconsistent in their decisions.

As the majority states, arbitrator Akemann found " 'no objective evidence [existed] of *** injury to the Petitioner's head, neck, low back or right shoulder as a result of the *** accident.' " 337 Ill. App. 3d at 605. This finding by arbitrator Akemann is consistent with arbitrator Caliendo's second decision when Caliendo found "the Petitioner is able to secure employment and is not entitled to maintenance or further vocational rehabilitation from the Respondent." TTD was stopped by Caliendo on September 7, 1993.

The majority determines that because the Commission awarded medical expenses for claimant's neck, right shoulder, and back, the Commission is inconsistent in determining "such treatment failed to support an award." 337 Ill. App. 3d at 606. This logic escapes me. That the arbitrator described the injury and authorizes the payment of medical bills does not foreclose a finding of no permanent injury. The Commission has simply awarded expenses for medical treatment but did not find permanency.

The majority cites *Heller Financial Inc. v. Johns-Byrne Co.* in adopting the law of the case doctrine. The issue here, the extent of claimant's injuries as "described" by arbitrator Caliendo, is not the law of the case. A review of his second decision makes it clear the statement was not and is not the law of the case.

Even if we accept the "description" statement as law of the case, that isolated sentence does not determine the permanency question. The detailed findings of Akemann concerning the medical evidence and his findings as affirmed by the Commission and confirmed by the circuit court make it clear the issues of TTD, impairment and medical expenses have been addressed. As to TTD, Caliendo's 1995 decision terminated TTD on September 7, 1993.

Finally, the majority remands this case to the Commission. I am at a loss to know what the Commission should do on remand. It has

already found there is no objective evidence of neurological or orthopedic injury to the head, neck, lower back, or right shoulder. The Commission decision affirming the award of arbitrator Akemann of 40% loss of use of the left leg as confirmed by the circuit court should be affirmed.